## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**MARTIN RAPAPORT, RAPAPORT USA, and INTERNET DIAMOND EXCHANGE, LLC,**

       **Plaintiffs,**

**v.**

**IDEX ONLINE, LTD., IDEX ONLINE S.A., IDEX ONLINE ISRAEL, LTD., JOHN DOES I-XX, and ROE CORPORATIONS I-XX,**

       **Defendants.**

**CIVIL ACTION NO: 04 06626 (RJH)**

_____/

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' FIFTH COUNTERCLAIM

Defendants, IDEX ONLINE, LTD., IDEX ONLINE S.A., IDEX ONLINE ISRAEL, LTD (herein collectively "IDEXONLINE"), hereby oppose Plaintiffs', MARTIN RAPAPORT, RAPAPORT USA, and INTERNET DIAMOND EXCHANGE, LLC. (herein collectively "RAPAPORT"), motion to dismiss IDEXONLINE'S Fifth Counterclaim seeking declaratory judgment of non-infringement of patent and patent invalidity on the ground of lack of subject mater jurisdiction.

1

TABLE OF CONTENTS

A.	Standard of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.	Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C.	FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.	RAPAPORT's Covenant Not To Sue Was Not Unconditional . . . . . . . . . . . . . . . . . . . . 15

E.	IDEXONLINE's Abuse of Process Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

F.	CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TABLE OF CITATIONS

Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996)

Benitec Australia, LTD v. Nucleonics, Inc., 495 F.3d 1340, 1343 (Fed. Cir. 2007)

Boston Sci. Corp. v. Johnson & Johnson Inc., 2008 U.S. Dist. LEXIS 5510 (D. Del. 2008)

Bright View Trading Co. v. Park, 2004 U.S. Dist. LEXIS 18572, 16-17 (S.D.N.Y. 2004)

Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96 (1993)

Chrysler Corp. v. Fedders Corp., 540 F. Supp. 706, 714 (S.D.N.Y. 1982)

Cordance Corp. v. Amazon.com, Inc., 521 F. Supp. 340 (D. Del. 2007)

Curiano v. Suozzi, 63 N.Y.2d 113, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (N.Y. 1984)

FieldTurf USA, Inc. v. Sports Constr. Group, LLC, 507 F. Supp. 2d 801 (N.D. Ohio 2007)

Halliburton Energy Servs. v. M-I LLC, 2008 U.S. App. LEXIS 1421 (Fed. Cir. 2008)

In Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 S. Ct. 270, 273 (1941)

In re Rivastigmine Patent Litig., 2007 U.S. Dist. LEXIS 28576, 17-18 (S.D.N.Y. 2007)

Klass v. Frazer, 290 F. Supp. 2d 425 (S.D.N.Y. 2003)

Madey v. Duke Univ., 307 F.3d 1351, 1362 (Fed. Cir. 2002)

MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 771 (2007)

Microsoft Corp. v. AT&T Corp., 127 S. Ct. 1746, 1750 (2007)

O'Bradovich v. Village of Tuckahoe, 325 F. Supp. 2d 413, 434 (S.D.N.Y. 2004)

Soitec v. Silicon Genesis Corp., 81 Fed. Appx. 734, 737 (Fed. Cir. 2003)

Teva Pharm. USA, Inc. v. Novatis Pharm. Corp., 482 F.3d 1330, 1338-39 (Fed. Cir. 2007)

A.    Standard of Law

The Supreme Court and the Federal Circuit recently explained subject matter jurisdiction sufficient to maintain a Declaratory Judgment action (herein "DJ" action) for patent non-infringement and invalidity.  "A party seeking to base jurisdiction on the Declaratory Judgment Act bears the burden of proving that the facts alleged, 'under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, **of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" Benitec Australia, LTD v. Nucleonics, Inc., 495 F.3d 1340, 1343 (Fed. Cir. 2007)(emphasis added)(quoting MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 771 (2007))[1]. RAPAPORT correctly cites to both the Benitec and MedImmune cases as established legal authority on this topic. However, IDEXONLINE disputes RAPAPORT's application of these cases to the facts in the instant case.

The MedImunne court explained: "Our decisions have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts....' [W]e summarized as follows: 'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, **of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" MedImmune, 127 S. Ct. at 771(emphasis added)(citing In Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 S. Ct. 270, 273 (1941)). As the court in Benitec explained, "[a] useful question to ask in determining whether an actual controversy exists is what, if any, cause of action

_____

[1]In RAPAPORT's Motion to Dismiss, this quote is cited to as authority under MedImmune, however, the correct citation comes from Benitec. IDEXONLINE has no objection to this mis-citation, and agrees that this is the applicable law to be applied herein.

the declaratory judgment defendant may have against the declaratory plaintiff." <u>Benitec</u>, 495 F.3d at 1344. The question of adequate jurisdiction has long been resolved, as long as a party has been charged with infringement. <u>See</u> <u>Cardinal Chem. Co. v. Morton Int'l, Inc.</u>, 508 U.S. 83, 96 (1993); <u>see also</u> <u>Benitec</u>, 495 F.3d at 1344. However, "once that burden has been met, absent further information, that jurisdiction continues." <u>Id</u> at 1344-45.

The Supreme Court in <u>Cardinal</u> explained, that if there are changes in the controversy, then a party may bring forth evidence of the subsequent events, in order to satisfy the burden. <u>See</u> <u>Cardinal</u>, 508 U.S. at 98. The Supreme Court noted however, that the standard for determining the existence of an actual controversy does not amount to a bright line rule.  <u>MedImmune</u>, 127 S. Ct. at 771. After a review of the facts established by the party asserting a DJ action, the Court must analyze whether the DJ plaintiff can "show that **its future plans** meet the immediacy and reality requirement of MedImmune...." <u>Benitec</u>, 495 F.3d at 1348-49(emphasis added). As a result, there is no requirement that the parties show there are current or actualized infringing activities occurring at all times during the lawsuit, other than the previously identified requirement in the initial filing of the infringement action.

While RAPAPORT has pointed out to the Court that <u>Benitec</u> is procedurally similar to the case at hand, the Federal Circuit made very specific and relevant factual inquiries before reaching their  determination approving dismissal of the DJ action.  The court in <u>Benitec</u> ultimately found there was no immediacy and reality for several reasons, which included (i) the only steps taken by DJ plaintiff Nucleonics towards the potentially infringing activity were discussions with unnamed potential customers; (ii) an execution of a confidentiality agreement in furtherance of the same; and, (iii) whether testing the accused drug on animals was patent infringement. <u>See</u>  <u>Benitec</u>, 495 F.3d at 1349.  This was insufficient information for the court to assess whether the DJ plaintiff's future

4

activities would be infringing. See id at 1349. As the Federal Circuit explained, "federal courts are to decide only actual controversies by judgment which can be carried into effect, and not to give opinions on moot questions or abstract propositions. . . . Although there can be a fine line between declaratory judgments and advisory opinions, the Supreme Court maintains the necessity of avoiding issuing advisory opinions on hypothetical facts." Teva Pharm. USA, Inc. v. Novatis Pharm. Corp., 482 F.3d 1330, 1338-39 (Fed. Cir. 2007)(citations omitted).

A review of all post Benitec cases show that the ultimate question of "immediacy and reality" is one of fact. Post Benitec courts have held that various factual scenarios establish a "real and immediate" dispute between the parties sufficient to support continuance of the DJ action. See Cordance Corp. v. Amazon.com, Inc., 521 F. Supp. 2d 340 (D. Del. 2007)(finding that, among other reasons, creation and development of software's architecture coupled with internal operation of the same was sufficient to support a case or controversy); Boston Sci. Corp. v. Johnson & Johnson Inc., 2008 U.S. Dist. LEXIS 5510 (D. Del. 2008)(finding there was sufficient immediacy and reality to support a DJ action because DJ plaintiff intended to sell the accused product and was awaiting FDA approval for the same); FieldTurf USA, Inc. v. Sports Constr. Group, LLC, 507 F. Supp. 2d 801 (N.D. Ohio 2007)(finding that the covenant not to sue was "not sufficiently unconditional"). Therefore, a detailed factual inquiry is necessary in order to determine whether there is "**sufficient immediacy and reality**" to support the present DJ action by IDEXONLINE.

B.    Procedural History

RAPAPORT filed its Fifth Amended Complaint in 2005 and added an allegation of patent infringement as Count Ten. Within a month, IDEXONLINE served two Rule 11 notice letter explaining non-infringement. See letters at Dkt. 72, Rule 11 Exh. A. RAPAPORT never responded to IDEXONLINE's Rule 11 non-infringement analysis. In the instant case, discovery was to close

on October 15, 2007, the case had been ongoing for nearly three years, and no trial date was set.  On the eve of the deadline for submission of the patent expert witness report, RAPAPORT filed a Motion to Dismiss its patent infringement claims WITHOUT prejudice. (Dkt. 69-3).  RAPAPORT's motion stated: "it did not seem likely that it could prove infringement in this matter without the expenditure of expenses – including legal and expert fees – **that** [sic] **did were not commercially justified**." (Dkt. 69-3, Motion to Dismiss, pg. 4)(emphasis added).  RAPAPORT explains that the document discovery "indicated no 'smoking gun' or other proof that defendants infringed patent here.... [and the] expenditure of resources [was] out of proportion to the benefit to be gained by continuing to prosecute the claim." Motion to Dismiss, pg. 5.

During numerous depositions of defendant-counterplaintiff IDEXONLINE personnel, including its CEO (Abraham Stern), its Chairmen of the Board (Ehud Cohen), and IDEXONLINE's chief technical developer (Tamar Katzav), RAPAPORT never asked about (i) the patent in suit; (ii) the then current IDEXONLINE Internet based diamond transaction service and system; (iii) new developments, new services or new technologic components of the IDEXONLINE Internet based diamond transaction service; and/or (iv) future developmental efforts or plans or patents relative to the IDEXONLINE Internet based diamond transaction service.  During this discovery cycle from September - December 2007, RAPAPORT's counsel never asked about nor mentioned the Borgato patent in suit during the four (4) depositions taken. He never asked any technical questions about IDEXONLINE's diamond trading service and Internet system. Nor have Plaintiffs ever sought to depose any of IDEXONLINE's technical personnel or any of the third parties that have worked with IDEXONLINE to develop the IDEXONLINE web site.

What is more, during the depositions, Martin Rapaport and Plaintiff's in-house counsel, Saville Stern admitted that, despite the fact that Plaintiffs had access to an active IDEXONLINE

membership since before the action was commenced in Nevada in 2004, neither Mr. Rapaport nor any of Plaintiff's employees or agents *have ever* familiarized themselves with IDEXONLINE's system or services.[2]

It is not surprising that RAPAPORT failed to find the "smoking gun" of patent infringement given its failure to ask technical questions about the IDEXONLINE service and system.  How could "the smoking gun of infringement" be found if RAPAPORT never asked questions about the patent or IDEXONLINE's technical operations?  Since RAPAPORT never asked nor inquired about IDEXONLINE's current or future projects or services, it cannot now claim surprise that IDEXONLINE's services have changed to include an internally operational bid communication service.

This Court granted RAPAPORT's Motion to Dismiss Count Ten of the Fifth Amended Complaint for patent infringement WITH prejudice on December 19, 2007 (Dkt.83) after IDEXONLINE pointed out that patent infringement was a continuing tort and dismissal without prejudice simply permits RAPAPORT to re-file its claim at will at any time and collect all back damages.  Importantly, that same Order explained that "the Fifth Counterclaim for declaratory relief, **shall not be impacted by the dismissal** of Count Ten of the Fifth Amended Complaint, and the prosecution thereof shall proceed..." (Dkt. 83)(emphasis added).  At that time, the Court reset the patent discovery for an additional six months.  Two weeks before the absolute end of patent discovery (February 29, 2008; Dkt. 83), RAPAPORT filed the present Motion to Dismiss along with

---

[2]Rapaport has made many attempts at delaying discovery and progression of this case, by claiming a need for the source code related to the current public IDEXONLINE system. As stated on numerous occasions, this information is not necessary in order to complete the patent infringement and comparison investigation.

its Covenant Not to Sue, releasing IDEXONLINE from all future patent infringement for its current, publicly available service and system.

The Covenant Not to Sue surprised IDEXONLINE since no prior RAPAPORT pleadings nor pre-motion filing letters suggested this act, despite the clear change in law as of July 2007 due to the holdings in Medimmune and Benitec. These cases were handed down prior to RAPAPORT's first motion to dismiss, Dkt. 69-3. The Court should recall that on November 20, 2007, IDEXONLINE's counsel argued the applicability of Medimmune at the hearing on RAPAPORT's motion to dismiss the count for patent infringement. Now RAPAPORT seeks to dismiss IDEXONLINE's counterclaims after dragging this litigation on with multiple patent expert witness reports, multiple patent claim charts and after IDEXONLINE filed its Unilateral Claim Construction Report (Dkt. 91, 92) on February 29. The Court had ordered the parties to file a joint claim report (Dkt. 83) but RAPAPORT refused to participate in the preparation of a joint report.

Interestingly with its newly filed Covenant Not to Sue, RAPAPORT is once again attempting to extricate itself from patent infringement litigation which it started in 2005. This long overdue concession by RAPAPORT further buttresses IDEXONLINE's August 2005 Rule 11 warning letters and its 2007 Rule 11 motion (Dkt. 71-2) alleging RAPAPORT's complete failure to conduct an adequate pre-filing patent infringement investigation. Further, the recent Covenant Not to Sue adds to the growing evidence of the abuse of process by RAPAPORT forming the basis for IDEXONLINE's counterclaims. Through this entire court proceeding, RAPAPORT has continually backed down and retreated due to alleged "financial burdens" associated with their patent case. Now it seeks to insulate and shield itself and its patent property from judicial scrutiny. It should not surprise the Court that IDEXONLINE plans to file a motion for summary judgment of patent invalidity since the patent claims in suit are so convoluted and confusing that ordinary computer

technicians cannot understand what is covered and what is not covered in the patent claims.  See Unilateral Claim Construction Report filed February 29, Dkt. 91, 92, section C5.0 discussing confusion of the "removal of data" claims in the system.

"It is particularly inappropriate to place the burden of establishing continuing jurisdiction on declaratory plaintiffs where, as here, the claim of mootness is the result of the opposing party's acts designed, at least in part, to defeat declaratory jurisdiction. '[T]here is an important public interest in protecting the legal system against manipulation by parties, especially those prone to involvement in repeat litigation, who might contrive to moot cases that otherwise would be likely to produce unfavorable precedents.'" Benitec, 495 F.3d at 1353(DYK, dissenting)(quoting Hart and Wechsler, The Federal Courts and the Federal System 204 (5th ed. 2003)).

RAPAPORT's actions continue to establish a pattern of inappropriate delay and tactics of confusion.  On pages 1 and 2 of RAPAPORT's Motion to Dismiss, it discusses prior settlement offers. These settlement negotiations were and are confidential and such discussions are never admissible in court proceedings. Fed. R. Evid. 408.  As a result, IDEXONLINE,  respectfully requests that this Court restrain from considering any portion of those statements.

C.    FACTS

As noted above, the Benetic case and all of its progeny require the court to make factual inquiries into the whether a party can "show that **its future plans** meet the immediacy and reality requirement of MedImmune...." Benitec, 495 F.3d at 1348-49 (emphasis added).  The question is, "in each case ... whether the facts alleged, **under all the circumstances,** show that there is a substantial controversy, ... **of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" MedImmune, 127 S. Ct. at 771(emphasis added)(citations omitted).

In the absence of probing deposition questions by RAPAPORT, IDEXONLINE will now disclose, via the declaratory statements of CEO Abraham Stern, submitted under court seal, (i) its current Internet based diamond transaction service with an "internally active" bid communication service[3] and (ii) its immediate future plans to perfect the same to handle vast sums of money and valuable diamond transactions to its worldwide customer base. Stern's declaration filed under seal shows sufficient "immediacy and reality" and not some hypothetical or uncertain technology.[4]

"[The patent] claims delineate the patentee's right to exclude, [and therefore] the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." Halliburton Energy Servs. v. M-I LLC, 2008 U.S. App. LEXIS 1421 (Fed. Cir. 2008)(citing Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996)).

The relevancy and reality of the IDEXONLINE bid communication service compared to patent claim 1 of the Borgato patent in suit is apparent by the side-by-side comparison of the Patent claim elements in bold type adjacent comments on IDEXONLINE's bid communication service. See attached the Appendix for a complete comparison and a copy of the Patent at Dkt. 93-2.

---

[3] The internally active bid communication service is operable and active in IDEXONLINE's non-U.S. development office. This internally active bid service is not publicly available or operational at this time.

[4] Due to the highly competitive nature of the parties in this case, the factual details showing immediate and real technologic operations of IDEXONLINE are filed separately under seal. The Protective Order (Dkt.66) covers the submission of highly proprietary material under seal with the Court. For these reasons, the confidential and time sensitive information, which will support the continuing jurisdiction of this Court, must be submitted under seal.

| Borgato Claim 1. A system for listing and facilitating transactions involving stones ... **compar[ing] the [offer] price to determine the lowest offer price for a stone offered** for the category position... | IDEXONLINE: "offer price for a stone" from the IDEXONLINE chart of diamonds for sale ? |
|---|---|
| display a matrix ... and for each category ... [display a] **price from the stone data** assigned to the primary position; | "bid price to buy" OR "offer price to sell" ? |
| **means for the buyer to communicate a bid** to the host processor ... | "bid communication service" ? |
| **means to compare a bid with said displayed offer price**, (i) if said bid matches ... communicate over said link to the identified seller and buyer of the stone that a **sale has been made** ... and (ii) **if the bid is lower than the displayed offer price** ... determine the highest bid for the category ...[and] assign[] to a primary bid position ... | "bid communication service" ?<br><br>"bid communication service" ? |

Stern's Declaration, filed under seal, details the fear IDEXONLINE continues to be placed under and highlights the concerns revolving around Rapaport's eleventh hour Covenant Not to Sue. IDEXONLINE has engaged in ongoing development efforts, including filing patents and continually improving its Internet based diamond transaction service and system.  The Federal Circuit has explained that ongoing R & D efforts can support a charge of patent infringement.

> There is no fair use or research and development exception for infringement of normal commercial processes.....The district court did not err in instructing "that **the same test for infringement should apply to any accused activity, regardless of whether the accused activity took place at the research and development stage** or whether it took place at the manufacturing stage." Because **infringement during the early stages of process development is nonetheless a violation of patent law**, the district court was under no duty to distinguish research and development from later commercial processes.

Soitec v. Silicon Genesis Corp., 81 Fed. Appx. 734, 737 (Fed. Cir. 2003)(emphasis added)(citing Madey v. Duke Univ., 307 F.3d 1351, 1362 (Fed. Cir. 2002)("the experimental use defense is . . . limited to actions performed 'for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry'")).

As a result, IDEXONLINE's developmental bid communication service is subject to a patent infringement claim. The bid communication service is internally active and operational in IDEXONLINE non-U.S. development offices.  Even non-public, internally active computer programs can serve to keep jurisdiction alive when determining if there is **sufficient immediacy and reality**. See Cordance Corp. v. Amazon.com, Inc., 521 F. Supp. 2d 340 (D. Del. 2007)(finding that, a non-public, internally operating Internet program or process, which was earlier used by the public but then disabled from public use, was sufficient to support a DJ action.)

All of the R & D for the IDEXONLINE bid communication service has occurred outside the U.S. and was not previously produced.  Further, IDEXONLINE continues to make relevancy objections relating to aspects of the broad based discovery requests by Rapaport.  Non-U.S. activities and developments cannot support a finding of patent infringement claim as noted by the Supreme Court. "It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country." Microsoft Corp. v. AT&T Corp., 127 S. Ct. 1746, 1750 (2007).

One public developmental document, which was never the subject of inquiry by RAPAPORT during its five (5) depositions of IDEXONLINE personnel, is IDEXONLINE's published patent application, Serial No. 11134039, filed May 2005, and published by the U.S. Patent and Trademark Office on November 23, 2006, as Pub. No. 2006/0265310 (herein the "Application").  The IDEXONLINE service and system described in the Application is titled "Realtime Transparent Commodity Index and Trading Database." The Application is submitted herewith as Exhibit B. See IDEXONLINE's Notice of Filing Supporting Exhibits. The Application describes an Internet based diamond transaction service and system as follows:

> **The computerized method creates,** maintains and displays realtime indexes and **a trading database for diamonds** ... and **the system may include a communications routine to facilitate sales.**

Exh. B. pg. B-1 (emphasis added).

The Application in Fig. 2 (pg. B-3) describes a broad outline of the bid communication service with Buy/Sell computer process sub-routine 56C. The illustrated process includes functional steps including (a) selection of a diamond D record by a buyer or seller (block 174); (b) subsequent activation of a communications or "Comm" link facilitating a parties agreement on a diamond price $ (block 176); (c) generation of instructions to a courier and an escrow agent (block 178); (d) notation of the shipment of diamonds (block 180); and (e) either the transaction closing or the return of diamonds (block 182).

As explained in more detail in Stern's Declaration, IDEXONLINE has, as of this date, an internally operable bid communication service which is an embodiment of the "Comm Link + Agree $" process in block 176 of the Application.  The internally operable bid communication service establishes the legal requirement "**of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" MedImmune, 127 S. Ct. at 771(emphasis added)(citations omitted).  The Court must analyze whether IDEXONLINE, as a DJ plaintiff, can "show that **its future plans** meet the immediacy and reality requirement of MedImmune...." Benitec, 495 F.3d at 1348-49 (emphasis added).

The publicly available Patent Application describes the Internet based diamond transaction service with one embodiment of the bid communication service as follows:[5]

---

[5]  The Patent Application describes in greater detail its purpose in the "Objects of the Invention" which includes providing "a realtime, transparent, commodity index and trading database for diamonds," para. 005, and "an application service provider (ASP) computerized method and information processing system which implements the realtime, transparent trading database," para. 011.  Exh. B, pg. B-13.  The details of one of the several available bid communication services is described as including "a communication link between the buyer and

      Rather than activating the market data sub-routine 56A, or the diamond search sub-routine 56B, the user may also select the buy/sell routine 56C.  In this situation, in step 174, the buyer selects a diamond record.  **In step 176, the buyer and/or the seller activates a communications link.  The buyer and seller then establishes a price for the purchase of the diamonds offered for sale in the diamond database 14.**  In step 178, the system communicates and interacts with a courier to deliver the goods to the buyer from the seller and also contacts and facilitates the transaction with a financial escrow agent.

Exh. B, pg. B-21 para. 058 (emphasis added).

      The internally operable bid communication service is an out growth of the currently publicly operable IDEXONLINE Internet based diamond transaction service.  The currently public Internet based diamond transaction service can be viewed with the multimedia presentation titled "Take a Tour" at www.idexonline.com. See "Members Access" (insert any user name and any password at "log-in" (no approved password is necessary), and on the "Log-In" screen, select "Take a Tour."). The currently public IDEXONLINE Internet based diamond transaction service (a) permits a buyer to search for a specific diamond offered for sale by a seller and view a table listing numerous diamonds fulfilling the search request; (b) after selection of a single diamond record, the user can view details of the selected diamond; (c) permits the buyer to call the seller by providing the seller's telephone number OR enable the buyer to go to the seller's web site (both communications channels are off-line or out-of-system communications); (d) OR permit the buyer to email the seller with a bid price; and, (d) thereafter the buyer and seller can close the diamond sale transaction off-line and out-of-system without the assistance of a communication channel by the IDEXONLINE service.

---

seller.  This communication link, includes, in one embodiment, an instant messaging IM service and may also include an email facility such that the potential buyer could compose an email to be sent to the seller via a normal email communications channel.  The implementation of a phone dialing service as a communications link and the use of a hyperlink from the diamond database website to the supplier's website is also contemplated by this communications link step 172."
para. 057.   Exh. B, pg. B-21.

The new, internally operable bid communication service is an enhancement of the currently public IDEXONLINE Internet based diamond transaction service (viewable on-line at www. idexonline.com as "Take a Tour") and is an internally working embodiment of a portion of IDEXONLINE's publicly available Patent Application.  More details of the internally operable bid communication service are set forth in Stern's Declaration filed under seal herewith.

These facts establish that IDEXONLINE has met the burden to maintain the present DJ action in that "**its future plans** meet the immediacy and reality requirement of MedImmune," Benitec, 495 F.3d at 1348-49 (emphasis added), and "there is a substantial controversy, between parties having adverse legal interests, **of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" MedImmune, 127 S. Ct. at 771(emphasis added)(citations omitted).

The bid communication service is currently undergoing detailed testing outside of the U.S. because the IDEXONLINE Internet based diamond transaction service is designed to support a high dollar volume of trades and considerable quantities of diamonds.  IDEXONLINE will disclose its U.S. operation of the bid communication service when the same is deployed in the U.S..  Therefore, IDEXONLINE requests that the Court permit it to supplement the court record as its U.S. operations of the bid communication service occur.

D.      RAPAPORT's Covenant Not To Sue Was Not Unconditional

As explained above, the sufficient immediacy and reality prongs of a DJ action must be met in order to retain jurisdiction once a covenant not to sue is provided. However, that covenant must be unconditional and must cover the sufficiently immediate and real actions which would fall under any reasonable infringement analysis. Prior to filing the eleventh hour Covenant Not to Sue, RAPAPORT had every opportunity to review the publicly available Patent Application as of November 23, 2006.  Yet despite this information, RAPAPORT's Covenant Not to Sue does not

cover this Patent Application, or any embodiment thereof.  In fact, the covenant only covers what is "IDEX's website located at www. idexonline.com as it currently exists as of the date of this covenant." (Dkt. 89).  As the courts have found, a covenant that is not unconditional will not allow a party to have a claim dismissed based upon subject matter jurisdiction. A recent Southern District of New York case establishes that even potential changes in a patent application should be covered by the covenant not to sue. See In re Rivastigmine Patent Litig., 2007 U.S. Dist. LEXIS 28576, 17-18 (S.D.N.Y. 2007).

> Here, since the covenant not to sue fully releases Watson from liability for infringement of the '176 patent based on products that "are the subject of and described in Watson's ANDA No. 77-129" (Watson Covenant), any "reasonable apprehension" of suit can only be based on potential amendments to Watson's ANDA. As explained below, **language releasing Watson from liability for any amendments to ANDA No. 77-129 must be added to Novartis ' covenant not to sue in order to fully eliminate the controversy at bar**. Assuming such language is added to Novartis ' covenant, there will no longer be any basis for this Court to continue to exercise jurisdiction over Watson's counterclaims for declaratory judgment on the '176 patent.

Id; see also FieldTurf USA, Inc. v. Sports Constr. Group, LLC, 507 F. Supp. 2d 801 (N.D. Ohio 2007)(finding that the covenant not to sue was "not sufficiently unconditional").

E.    IDEXONLINE's Abuse of Process Counterclaim

IDEXONLINE asserted an abuse of process counterclaim against RAPAPORT in its Fifth Amended Answer and Counterclaim. (Dkt 57). This abuse of process claim requires that the Court make a full inquiry into the viability of both patent infringement and validity assertions by RAPAPORT in light of IDEXONLINE's positions of non-infringement and invalidity.  In other words, the Court must rule on patent infringement and validity since those are predicate acts in the abuse of process counterclaim.  "An abuse of process claim has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective."

O'Bradovich v. Village of Tuckahoe, 325 F. Supp. 2d 413, 434 (S.D.N.Y. 2004)(citing Klass v.

Frazer, 290 F. Supp. 2d 425 (S.D.N.Y. 2003); Curiano v. Suozzi, 63 N.Y.2d 113, 469 N.E.2d 1324,

480 N.Y.S.2d 466 (N.Y. 1984)). Throughout the litigation, IDEXONLINE has asserted that this case

by RAPAPORT was brought in an effort stifle and crush IDEXONLINE, a newcomer in the field

of providing accurate diamond trading information to its customers with an Internet based service

and system.  The assertion of unjustified claims of patent infringement, subject to the pending Rule

11 motion (failure to conduct an adequate pre-filing investigation), is one of the supporting elements

of the abuse of process.   IDEXONLINE's counterclaims for declaratory judgment regarding non-

infringement and invalidity are encompassed and subsumed by its abuse of process claim because

the evidence at trial will show that RAPAPORT had no factual basis for assertion of its patent claims

because no one read the patent AND no one adequately studied the IDEXONLINE system.

RAPAPORT initially sought to dismiss its patent claim without prejudice and then, after

objection by IDEXONLINE, the Court dismissed RAPAPORT's claims with prejudice.  This

dismissal is but one factor in the broad-based abuse of process claim by IDEXONLINE.  Regardless,

"[u]nlike a malicious prosecution claim, abuse of process does not require a prior favorable

determination...." Bright View Trading Co. v. Park, 2004 U.S. Dist. LEXIS 18572, 16-17 (S.D.N.Y.

2004)(citing Chrysler Corp. v. Fedders Corp., 540 F. Supp. 706, 714 (S.D.N.Y. 1982)).

IDEXONLINE's Rule 11 Motion highlights the wholly inadequate steps and RAPAPORT's

recklessness in pursuing this litigation. In order to weigh the merits of the abuse of process claim,

the Court will ultimately make the same patent inquiry as required in the DJ action for non-

infringement and invalidity. The two counterclaims are intertwined and the dismissal of the

DJ action would be prejudicial upon IDEXONLINE regarding the abuse of process counterclaim.

F.     <u>CONCLUSION</u>

The Court must deny RAPAPORT's motion because IDEXONLINE's "**future plans** meet the immediacy and reality requirement of MedImmune," <u>Benitec</u>, 495 F.3d at 1348-49 (emphasis added), and "there is a substantial controversy, between parties having adverse legal interests, **of sufficient immediacy and reality** to warrant the issuance of a declaratory judgment.'" <u>MedImmune</u>, 127 S. Ct. at 771(emphasis added)(citations omitted).  IDEXONLINE has requested that the Court permit it to supplement the Court record as IDEXONLINE rolls out, in the U.S., the new bid communication service.  Further, the motion to dismiss should be denied since the abuse of process claim requires the same inquiry. [6]

WHEREFORE, IDEXONLINE requests that the Court deny RAPAPORT's Motion to Dismiss the Fifth Amended Counterclaim.

Dated: <u>Mar  3, 2008</u>              Respectfully submitted,

                                        By: <u>/Robert Kain/</u>
                                        Robert C. Kain, Jr., Esq. (RK 7454)
                                        Florida Bar No. 266760
                                        <u>RKain@FocusOnIP.com</u>
                                        Fleit, Kain, Gibbons, Gutman, Bongini & Bianco, P.L.
                                        750 Southeast 3rd Avenue, Suite 100
                                        Fort Lauderdale, Florida 33316
                                        Telephone:     (954) 768-9002
                                        Facsimile:     (954) 768-0158
                                        Counsel for Defendants

cc:     Esther S. Trakinski, Esq.
        752 West End Avenue
        New York, New York 10025
        Telephone: 917-748-1543
        Co-Counsel for Defendants

---

[6] If the Court grants RAPAPORT's Motion to Dismiss, IDEXONLINE will seek leave to file a motion for attorney's fees in accordance with the exceptional cases provision of the Patent Statute, 35 U.S.C. §285.

**APPENDIX CORRELATING Bid Communication Service and Borgato Patent Claim 1**

The following chart shows the relationship between patent claim 1 in the Borgato Patent, Dkt. 093-2, col. 15, line 40 and IDEXONLINE's bid communication service.  See Patent at Dkt. 93-2.

| Borgato Patent Claim | IdexOnline's service |
|---|---|
| 1. A system for listing and facilitating transactions involving stones categorized by weight and at least one other characteristic relating to the gem comprising: | |
| a host processor having a first data structure storing for each stone offered for sale data of stone weight, the characteristic, offer price and seller identification data, said processor including (i) means for arranging said data into a data matrix array wherein stone data for like weights and like characteristics is assigned to a designated category position in the array and (ii) means to **compare the price to determine the lowest offer price for a stone offered** for the category position and, for said lowest determined offered price, assigning said stone data to a primary offer position in the array category; | "offer price to sell a stone" |
| a plurality of remote terminals each including a display; | |
| a data link between said terminals to said host processor by which a seller and a buyer may initiate communication with the host processor, said processor in response to initiation of communication adapted to issue signals to the terminal to display a matrix corresponding to said data matrix array and for each category the **price from the stone data** assigned to the primary position; | "bid price to buy" OR "offer price to sell" ? |
| means for a seller of a stone to open communication with the host processor from a terminal and to input stone data for a stone to be offered for sale; | |
| means for a buyer of a stone to open communication with the host processor from a terminal; | |
| means to select a category position from the matrix at the display, said host processor in response to said selection displaying at least the stone data of weight and said characteristic for the stone data assigned to the primary position; | |
| **means for the buyer to communicate a bid** to the host processor for at least the stone whose data is assigned to said primary position of the selected category; and | "bid communication service" ? |

| | |
|---|---|
| said host processor including **means to compare a bid with said displayed offer price**, (i) if said bid matches the offer price said processor including means to communicate over said link to the identified seller and buyer of the stone that a **sale has been made** and means for removing said stone data for the sold stone from the data matrix, said comparing means comparing the prices of the remaining stone data of said category to determine the lowest price for the remaining stones and assign the lowest priced remaining stone to the primary position and (ii) **if the bid is lower than the displayed offer price** said processor including means to store said bid in the array category and compare said bid with other stored bids to determine the highest bid for the category, said determined highest bid assigned to a primary bid position at the array category. | "bid communication service" ?<br><br>"bid communication service" ?<br><br><br><br>"bid communication service" ? |

## CERTIFICATE OF SERVICE

I hereby certify that a true accurate and correct copy of the foregoing was served via email on ___March 3_____ , 2008 on all counsel or parties of record on the attached service list.

_____/Robert Kain/_____
Robert C. Kain, Jr.

Service List:
Ronald D. Coleman, Esq.
Hoffman Polland & Furman, PLLC
220 East 42nd Street
Suite 435
New York, NY 10017
Tel:  (212) 338-0700
email: rcoleman @hpf-law.com

cc:    Michael Charish
        Co-counsel for Plaintiffs

\\srv1\datashare\RCK\CLIENTS\Angel\Rapaport-v-Idex\Mot-Dismiss-5th-counterclaim-opposition-022108-v7.wpd